UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DERRICK R. MONTGOMERY, | § | |
| | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | NO. 3:09-cv-1194-O |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
|     Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b) and the order of the District Court filed on June 25, 2009. The findings, conclusions, and recommendations of the Magistrate Judge, as evidenced by his signature thereto, are as follows:

Procedural History: On November 2, 2006, plaintiff Derrick Rashad Montgomery, hereinafter "Plaintiff" or "Montgomery") filed an application for disability insurance benefits ("DIB"), alleging a disability onset date of October 31, 2006. (Administrative Record (hereinafter "Tr." at 11)). He alleged disability due to muscle weakness, fatigue, and arthritis. (Tr. 122). His claim was denied by the state agency initially and on reconsideration, after which he requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held before ALJ Ward D. King on August 4, 2008, at which Plaintiff appeared with counsel and testified on his own behalf. The ALJ also received the testimony of vocational expert ("VE") Dr. Thomas R. Irons, Ed.D.

On December 17, 2008, the ALJ denied Plaintiff's request for benefits, finding that

Plaintiff had a severe combination of impairments, to wit: "right ankle sprain with degenerative joint changes, degenerative changes at L5-S1 of his spine with lumbar radiculpathy, osteoarthritis, tiny bilateral pleural effusions, a history of transverse myelitis,[1] restrictive pulmonary disease, cervical spinal stenosis with cervical radiculopathy, and obesity", (Tr. 13-14), but that he was still capable of performing his past relevant work as a customer service representative, collection clerk, and ticket seller. (Tr. 19). Plaintiff timely requested a review of the ALJ's decision by the Appeals Council and on May 5, 2009, the Appeals Council denied his request. (Tr. 1-3). Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review. *See Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002). Plaintiff filed his federal complaint on June 25, 2009. Defendant filed an answer on August 12, 2009. On September 17, 2009, Plaintiff filed his brief, followed by Defendant's brief on November 13, 2009.

Standard of Review - Social Security Claims: When reviewing an ALJ's decision to deny benefits, the scope of judicial review is limited to a determination of: (1) whether the ALJ's decision is supported by substantial evidence in the record and (2) whether the proper legal standards were applied in evaluating the evidence. *Castillo v. Barnhart*, 325 F.3d 550, 551 (5th Cir. 2003) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa*, 895 F.2d at 1021-22

---

[1] Transverse myelitis (TM) is an uncommon neurological syndrome caused by inflammation (a protective response which includes swelling, pain, heat, and redness) of the spinal cord, characterized by weakness, back pain, and bowel and bladder problems. It affects one to five persons per million. *See* http://medical-dictionary.thefreedictionary.com/transverse+myelitis.

(quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).  In determining whether substantial evidence exists, the court reviews the entire record, but does not reweigh the evidence, retry the issues, or substitute its own judgment.  *Villa*, 895 F.2d at 1022 (citations omitted).  When the Commissioner's findings of fact are supported by substantial evidence, they are conclusive.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

Discussion:   To prevail on a claim for disability insurance benefits, a claimant bears the burden of establishing that he is disabled, defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.1505.  Substantial gainful activity is defined as "work that [i]nvolves doing significant and productive physical or mental duties; and [i]s done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

The ALJ uses a sequential five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520.  Under the first four steps, a claimant has the burden of proving that his disability prevents him from performing his past relevant work, but under the fifth step, the burden shifts to the Commissioner to prove there is other substantial gainful activity that the claimant can perform.  *E.g., see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5 (1987); *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).  This burden may be satisfied either by reference to the Medical-Vocational Guidelines ("Grid Rules") of the regulations, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2, or by expert vocational testimony or other similar evidence.  *E.g., see Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  "A finding that a claimant is disabled or not disabled at any point in the five-step review is conclusive and

terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

In the present case, the ALJ proceeded to step four. He found that Plaintiff had not engaged in substantial gainful activity since October 31, 2006, his alleged onset date. (Tr. 13). He was 28 years old on his date of application, (Tr. 11), completed two years of college as of May 1998, (Tr. 128), and had past relevant work as a customer service representative, collection clerk, and ticket seller. (Tr. 19). The ALJ found Montgomery to have a severe combination of impairments, to wit: "right ankle sprain with degenerative joint changes, degenerative changes at L5-S1 of his spine with lumbar radiculopathy, osteoarthritis, tiny bilateral pleural effusions, a history of transverse myelitis, restrictive pulmonary disease, cervical spinal stenosis with cervical radiculopathy, and obesity", (Tr. 13), but that the combination of his impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14).

The ALJ found Plaintiff to have a residual functional capacity ("RFC") for a modified range of light work, subject to the following restrictions- lift and carry 20 pounds occasionally and 10 pounds frequently, sit throughout an eight-hour workday, stand and walk for two out of eight hours limited to fifteen minutes at any one time, and restricted from climbing ladders, ropes, and scaffolds, with only occasional balancing, stooping, kneeling, crouching, and crawling. (Tr. 14). He found that Montgomery's RFC would not preclude him from performing his past relevant work as a customer service representative, collection clerk, and ticket seller, and therefore concluded that Montgomery was not under a disability and denied his claim for benefits. (Tr. 19). Montgomery argues that the ALJ failed to properly weigh the evidence, particularly the medical opinions of his treating physicians, and failed to properly evaluate his

4

credibility.

<u>Medical History</u>:

The medical evidence includes records from at least five of Plaintiff's treating physicians: Dr. Jose Duarte, Jr., M.D., pain management specialist; Dr. Michael Gidcomb, M.D., pulmonologist; Dr. Terry Gemas, M.D., orthopedic surgeon; Dr. James P. Blakely, M.D., and Dr. Micke Smith, M.D., physicians; as well as consultative examiner Dr. Alfred G. Zevallos, M.D., examiner for the Social Security Administration (SSA). The history reveals that as a child, Montgomery suffered transverse myelitis at age nine, and was on ventilatory support for months through a tracheostomy. (Tr. 415).

On August 17, 21, and 24, 2006, Montgomery was treated by Dr. Gemas for a chronic right ankle sprain and pain in the ankle. (Tr. 189, 190, 207, 208). On September 12, 2006, he underwent right ankle arthroscopic debridement. (Tr. 186, 201-204). On September 21, 2006, Montgomery was healing well and he stated his right ankle was "feeling really good", (Tr. 206). Plaintiff's alleged disability onset date was October 31, 2006. On November 3, 2006, he returned to Dr. Gemas complaining of a new pain, this time a pain that "shot down the back of his leg and sometimes into his foot and ankle." (Tr. 205). Dr. Gemas assessed that Montgomery's history and exam were consistent with "right side radiculopathy, sciatica" and ordered a magnetic resonance image (MRI) to rule out disc herniation. *Id*. The MRI was conducted on November 4, 2006, and found a 3mm bulge between L4-L5 and a 2mm bulge between L5-S1, both without nerve root displacement or stenosis. (Tr. 200).

On November 9, 2006, Dr. Duarte assessed that Montgomery had a "[h]erniated disk with myelopathy at two levels, lumbar", low back pain, lumbar radiculopathy, ankle pain, a

history of possible polio, shortness of breath of unknown etiology, and a heart murmur. (Tr. 215). Montgomery was taking Naproxen (an anti-inflammatory) and Hydrocodone (a pain reliever), which provided some relief. *Id.* He noted that Montgomery complained of trouble sleeping, walking, and bending forward, with aching, stabbing, throbbing, burning, shooting, and tingling pain, and some numbness. (Tr. 214). The doctor ordered an EKG and chest x-ray, and planned to follow up with lumbar epidural steroid injections subject to the results of the EKG and x-ray. (Tr. 216). On November 13, 2006, the chest x-ray revealed pulmonary abnormalities, to wit: "poor inspiratory effort with crowding of microvascular marking and mild eventration[2] of the right hemidiaphragm but no consolidations or effusions." (Tr. 217). Dr. Duarte advised cardiac and pulmonary examinations prior to the lumbar epidural steroid injections. *Id.*

On November 16, 2006, pursuant to Dr. Duarte's recommendation, Montgomery was evaluated by Dr. Gidcomb regarding his exertional dyspnea. Dr. Gidcomb diagnosed severe restrictive lung disease and possible obstructive sleep apnea, opining that the conditions may have resulted from the transverse myelitis Montgomery had as a child. (Tr. 416-18). He advised Montgomery to use oxygen supplements during exertion and possibly during sleep. (Tr. 417). He recommended a CT angiogram and echocardiogram, and wrote a letter to the human resources department of Montgomery's employer stating that Montgomery should not return to work until after his follow-up appointment on February 14, 2007, and cautioned that Montgomery may not be able to return to work after that appointment due to the chronic conditions. (Tr. 417-18).

A CT angiogram performed by Dr. Blakely on November 18, 2006 revealed tiny bilateral

---

[2]Eventration: herniation of the intestines. *See* http://medical-dictionary.thefree dictionary.com/eventration.

pleural effusions but no pulmonary embolism. (Tr. 277). On December 28, 2006, Montgomery followed up with Dr. Gidcomb. (Tr. 413). The doctor described his overall condition as stable, noted that he no longer complained of headaches and he was continuing to sleep with the use of oxygen, and cleared him to undergo anesthesia for lumbar steroid injections. *Id*. Dr. Duarte also opined that Montgomery was stable to undergo lumbar steroid injections at a January 8, 2007 appointment, during which Montgomery reported that oxygen supplements relieved his shortness of breath. (Tr. 248-249). The doctor's physical examination revealed a herniated disc, low-back pain with neuropathy, ankle pain, and external dyspnea, but he noted that Montgomery was in no acute distress and could sit comfortably. *Id*.

Montgomery underwent the lumbar injections on January 11, 2007, and on January 22, 2007 Dr. Duarte assessed that his herniated disc and low back pain were improved as a result. (Tr. 252). He underwent a second injection on January 25, 2007, and on February 5, 2007, Montgomery and Dr. Duarte agreed that he was ready to return to work, so long as he proceeded slowly and did not increase his workload. (Tr. 265-266). On February 7, 2007, Dr. Zevallos performed a consultative physical examination for the State agency's Disability Determination Services ("DDS"), during which he noted that Montgomery had no localized muscle atrophy, normal lungs and heart, was able to sit and handle objects without difficulty, stood slowly, and was able to move fairly quickly despite abnormal gait. (Tr. 296-297).

On February 14, 2007, Dr. Gidcomb advised that Montgomery was able to return to work, subject to restrictions on lifting and walking fast. (Tr. 411). He noted that oxygen supplements were controlling the restrictive pulmonary disease, and that Montgomery's back pain had improved. *Id*. DDS physician Dr. Patty Rowley, M.D. assessed Montgomery with a

7

RFC for light work with standing limitations on February 28, 2007, noting that her findings were not fully supported by the medical evidence, and DDS physician Dr. John Wiley, M.D. concurred with those findings on May 24, 2007. (Tr. 308, 328).

On April 8, 2007, Dr. Smith opined that Montgomery was "totally disabled" based on an assessment that he "is unable to stand for more than two hours, walk for more than 15 minutes or do any lifting, pushing or pulling without worsening pain or fatigue." (Tr. 314). In mid-June 2007, after receiving a request for medical records from Plaintiff's counsel, Dr. Duarte requested that Montgomery return for a checkup. (Tr. 391-393). Dr. Duarte noted that Montgomery was in no apparent distress, but opined that he was "significantly hampered in his ability to do work due to his disability." (Tr. 392). On August 6, 2007, Dr. Duarte evaluated Montgomery and noted increased complaints of neck pain, right arm numbness, and muscle spasms, for which the doctor prescribed Skelaxin[3] and recommended an MRI to monitor the neck pain. (Tr. 404-405). Dr. Michael Ginsburg, M.D. performed the MRI on August 8, 2007, and noted mild narrowing in the C2-C4 regions of Montgomery's spine, with no narrowing in other regions. (Tr. 502-503).

On August 8, 2007, Dr. Gidcomb examined Montgomery and noted that he had reduced his supplemental oxygen to three times a week, which was insufficient, and he had diminished aeration in his lungs. (Tr. 507). He stated that Montgomery would benefit from bi-level positive airway ventilatory support (BIPAP), and opined that Montgomery should qualify for disability based on his ventilatory capacity impairment, although he stated that he would be able to perform a sedentary desk job although his chronic back pain would limit his ability to sit for long periods. *Id.*

---

[3]Skelaxin: a skeletal muscle relaxant. *See* http://medical-dictionary.thefreedictionary.com/skelaxin.

A pulmonary impairment questionnaire was completed by Dr. Gidcomb on August 18, 2007, in which he stated that Montgomery's impairments would cause "good days" and "bad days". (Tr. 448). A spinal impairment questionnaire completed by Dr. Duarte on November 9, 2007 noted a limited range of motion in the cervical and lumbar regions with tenderness, muscle spasms, sensory loss, muscle weakness, and also stated that the impairments would cause "good days" and "bad days". (Tr. 451-456). These questionnaires were both checklist-style forms with minimal description of the reasons for the choices selected.

On April 8, 2008, Dr. Duarte indicated that Montgomery was doing "somewhat well", could sit 30 minutes before his muscle spasms were aggravated, had numbness after sitting or standing for 30 minutes, and had trouble walking or climbing stairs. (Tr. 487-488). He noted Montgomery's lungs were stable, heart was normal, and that he had muscle spasms in the neck and lumbo-sacral region. *Id*. He made no changes to Montgomery's medications, and reported that Skelaxin alleviated the spasms and there was no evidence of muscle wasting or neurological problems. *Id*. On August 25, 2008, Dr. Gidcomb's associate Dr. Mark Ferris, M.D. saw Montgomery and noted his continued use of oxygen supplements and that prolonged walking caused him to develop dyspnea (shortness of breath). (Tr. 506).

**First**, Montgomery argues that the ALJ failed to properly weigh the evidence. The ALJ's decision and the briefs of both Plaintiff and Defendant all provide thorough summarizations of the medical evidence of record. (Tr. 13-18; Pl. Br. 2-15; Def. Br. 3-10). Plaintiff cites this court's ruling in *Brown v. Astrue*, 2009 WL 1228487, *9 (N.D.Tex. 2009), for the proposition that an ALJ may give less weight to a treating physician's opinion only when there is good cause shown to the contrary, that the ALJ must perform a detailed analysis of the

9

opinion under the criteria set forth in the Regulations, and that the ALJ may not summarily reject the treating physician's opinion based solely on the testimony of a non-examining medical expert. Montgomery argues that the ALJ did not accord proper weight to the opinions of treating physicians Dr. Duarte, Dr. Gidcomb, and Dr. Smith, instead ascribing significant weight to the non-examining State Disability Determination physicians.

The ALJ's summary of the medical evidence makes it clear that he considered the length of the treatment relationship Montgomery had with his treating physicians, the nature and extent of that relationship, the evidence supporting the opinions of the physicians, and their specialties. While doctors Duarte and Gidcomb opined on Montgomery's ability to return to and maintain employment, (*see, e.g.*, Tr. at 392), the determination that a claimant is unable to work is a legal conclusion reserved exclusively to the Commissioner. *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *see also* 20 C.F.R. § 404.1527(e)(1). The medical evidence of record shows that Montgomery's pain improved with treatment. (*see, e.g.*, Tr. 265-266, 487-488). Even in stating his opinion that Montgomery was disabled, Dr. Gidcomb recognized that Montgomery would be capable of performing some form of sedentary work. (Tr. 507).

The evidence clearly indicates that Montgomery suffers from a severe combination of impairments, and the ALJ's findings concerning Montgomery's severe impairments and their effects on his RFC (Tr. 13-14) are supported by substantial evidence. The ALJ considered the opinions of Montgomery's treating physicians, and his RFC is reflective of that- for example, he included Dr. Smith's RFC recommendations pertaining to limitations on standing for more than two hours or walking for more than 15 minutes in his RFC finding. (Tr. 14, 314). Moreover, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary

conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir.2000); *see also Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir.1994). In this case, the ALJ properly exercised his responsibility as fact finder in weighing the evidence and in incorporating limitations into his RFC assessment that were supported by the record. "These are precisely the kinds of determinations that the ALJ is best positioned to make." *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

**Second**, Montgomery argues that the ALJ failed to properly evaluate his credibility. "It is within the ALJ's discretion to determine the disabling nature of a [Plaintiff's] pain, and the ALJ's determination is entitled to considerable deference." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (citations omitted). The determination whether a Plaintiff is able to work despite some pain is within the province of the administrative agency and should be upheld if supported by substantial evidence. *See Jones v. Heckler,* 702 F.2d 616, 621-622 (5th Cir. 1983). Moreover, pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment to be disabling. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). In the Fifth Circuit, an ALJ must give reasons for rejecting a claimant's subjective testimony only where the evidence clearly favors the claimant. *Id.* at 163.

The ALJ considered the objective medical evidence as well as Montgomery's statements, and found that his statements "concerning the intensity, persistence, and limiting effects" of his symptoms were "credible in the sense that he is limited, but not in the sense that he is disabled." (Tr. 17). The ALJ referred to the clinical records of Montgomery's treating physicians, taking note of the limitations they found Montgomery to have. (Tr. 17-19). He found that Montgomery "was able to, and did, work for several years while suffering from the ailments he now asserts are disabling." (Tr. 17). The ALJ also considered Montgomery's testimony regarding his

11

activities of daily living. (Tr. 15).

Montgomery testified that he washes the dishes twice weekly with his mother performing all other household chores, that he requires the assistance of his mother to put on his socks and shoes due to his inability to bend his legs and knees, and that he has difficulty breathing and uses oxygen at night and when outside for extended periods. (Tr. 15). In reaching his credibility assessment, the ALJ considered the objective medical evidence, Plaintiff's subjective testimony, and Plaintiff's activities of daily living. He took account of the limitations he found Plaintiff to have in reaching his RFC determination. His credibility finding is supported by substantial evidence.

**RECOMMENDATION:**

For the foregoing reasons, it is recommended that the District Court enter its order AFFIRMING the decision of the Commissioner and its judgment DISMISSING this action with prejudice. A copy of this recommendation shall be transmitted to counsel for the parties.

Signed this 17th day of February, 2010.

WM. F. SANDERSON, JR.
UNITED STATES MAGISTRATE JUDGE

NOTICE

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge

is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.